**IN THE UNITED STATES DISTRICT COURT**
**THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

VINCENT D. YOUNG,
    Plaintiff,

v.                                         Civil No. 4:21-cv-00085

CHRISTINE WORMUTH, SECRETARY,
DEPARTMENT OF THE ARMY
    Defendant.

**MEMORANDUM OPINION**

Vincent Young ("Plaintiff" or "Young") brings this action against Christine Wormuth in her official capacity as Secretary of the Department of the Army ("Defendant" or "Secretary"). Young alleges that his employer, the Army's Training and Doctrine Command ("TRADOC"), retaliated against him for engaging in protected activity in violation of the protections conferred by Title VII of the Civil Rights Act. Compl. ¶¶ 86–91, ECF No. 1; *see* 42 U.S.C. § 2000e-16. The Secretary moves for summary judgment on Young's claim. ECF No. 32. As the issue is fully briefed, the matter is ripe for adjudication.

For the reasons stated below, the Secretary's motion for summary judgment, ECF No. 32, will be denied.

# I. BACKGROUND

## A. Facts[1]

Young's retaliation claim stems from two adverse personnel actions that occurred in 2016. Compl. ¶¶ 56, 59, 83. First, on March 23, 2016, Young's second level supervisor issued him a Letter of Reprimand, placed Young on two weeks paid administrative leave, and reassigned Young to a smaller division ("March reprimand and reassignment"). Def. Statement of Undisputed Facts ("DSUF") ¶ 42, ECF No 33. Second, on July 5, 2016, Young received a downgraded performance evaluation ("July evaluation downgrade"). *Id.* ¶¶ 44, 46; Evaluation Report, DEX 25.[2] Young alleges that these adverse actions occurred because he complained about certain hiring policies within TRADOC that he believed disadvantaged non-white and female applicants. Compl. ¶¶ 16–25; 40–53; 87–90.

### 1. TRADOC's Organizational Structure

Young began his employment with TRADOC in 2004. DSUF ¶ 1. TRADOC primarily provides education and training to the Army's soldiers and civilian leaders and, in furtherance of its mission, operates eight Centers of Excellence and thirty-seven Army schools. *Id.* ¶ 2; *see also About*, U.S. Army Training Doctrine and Command, https://www.tradoc.army.mil/about/. TRADOC also recruits soldiers and guides the Army through operational doctrine. DSUF ¶ 2. The events at issue in this matter took place within the Office of the Deputy Chief of Staff, which is

---

[1]     The following facts are drawn from the parties' Rule 56.1 statements and supporting exhibits. The Court did not consider Plaintiff Exhibit 1, ECF No. 41-1, which is a nineteen-page "statement of facts" in excess of the page limit requirement of Local Rule 7(F)(3) and not presented in accordance with Federal Rule of Civil Procedure 56. Unless otherwise indicated, the facts presented are undisputed.

[2]     The Court will cite to exhibits submitted by the Defendant as "DEX." Those exhibits are attached to ECF No. 33 unless otherwise noted. The Court will cite to Plaintiff's exhibits as PEX. Those exhibits can be found at ECF No. 41-1.

known as G-3/5/7 Operations, Plans, and Training ("G-3/5/7"). *Id.* ¶ 5. From March 2015 to February 2016, then-Brigadier General Douglas Gabram led G-3/5/7 as the Deputy Chief of Staff. *Id.* Sergeant Major Robert Moss assisted Gabram as an advisor during Gabram's tenure and similarly left TRADOC in February 2016. *Id.* ¶ 6; Moss Dep. 10:14–18, DEX 5. Brigadier General Robert Ulses assumed the Deputy Chief of Staff role in February 2016, serving until 2017. DSUF ¶ 5.

Two Senior Executive Services employees, David Brinkley and David Paschal, reported to the Deputy Chief of Staff during the time relevant to this matter. *Id.* ¶¶ 7–9. Paschal took over the role from an individual named Michael Formica. *Id.* ¶ 9. Each Senior Executive Service employee led roughly half of the divisions within G-3/5/7. *Id.* ¶¶ 8–9. Relevant here, Training Operations Management Activity ("TOMA"), reported to Paschal (and Formica before him). *Id.* ¶ 9.

TOMA managed all training courses across TRADOC and the Army, and as a result, had regular interaction with many components of the Army. *Id.* ¶ 10. Colonel Nathan Hunsinger reported to Paschal and served as the Director of TOMA beginning in 2014 and continuing through all times relevant to this action. *Id.* ¶ 11. From approximately 2007 to December 2014, Plaintiff Young served as the Plans Division Chief within TOMA. *Id.* ¶ 10. Young was promoted to Deputy Director of TOMA in December 2014. *Id.* While serving as Deputy Director, Young reported directly to Hunsinger and his second line supervisor was Paschal. *Id.* ¶ 11. At the time, approximately fifty-four employees worked within TOMA. Young Dep. 16:15–20, PEX 2.

2. Young's Complaints Regarding "No Colonel Left Behind"

In 2014, Young, who is Hispanic, complained to his second-line supervisor, Formica, Paschal's predecessor, that there was a perception among G-3/5/7 employees that retired colonels received preferential treatment in hiring and promotion decisions for leadership and

management-level positions. Formica Decl. ¶ 4, DEX 28; Young 1st Decl. ¶ 11, PEX 8. This "practice" was sarcastically referred to by employees as "No Colonel Left Behind" or the "Brass Ceiling." Paschal Dep. 128:16–130:3, PEX 3. Young also complained several times about the practice to his direct supervisor, Hunsinger, specifically alleging that the practice came at the expense of women and non-white applicants. Hunsinger Dep. 65:21–67:9, PEX 4.

In summer of 2015, TRADOC invited employees to respond to the annual command climate survey ("command climate survey"). DSUF ¶¶ 12, 14. Responses to the survey were submitted and reported anonymously and Army guidance requires that the surveyed audience include enough participants to preserve anonymity. *Id.* ¶ 13. Young submitted the following response to an open-ended question regarding equal opportunity:

> There appears to be a boy's club of retired officers. Almost all senior leaders are white, retired officers. This group receives preferential treatment for jobs, awards, bonuses, etc. Look at the records - on numerous occasions, certain people retire and walk straight into a job or people are preselected for a job (i.e. Brinkley, Paschal, etc.)

Young 1st Decl. ¶ 13, PEX 8 (cleaned up). Hunsinger was in the room as Young completed and submitted the survey, and Young described his submission to Hunsinger as he was completing the survey. Hunsinger Dep. 90:6–14, PEX 4.[3]

Additionally, on or around September 3, 2015, Young testified that he met with Gabram to discuss his concerns about G-3/5/7's hiring practices. Young Dep. 97:23–101:21, PEX 2. At this meeting, Young said he complained that his current second-line supervisor, Paschal, had tried to intervene in a hiring Young was conducting in favor of a white retired officer. *Id.*; Hunsinger Dep.

---

[3]     Notwithstanding this evidence, Hunsinger testified that he did not share any information he had regarding Young's response to the survey and could not identify that Young wrote the critique of G-3/5/7's hiring practices based purely off of the survey comment. Hunsinger Dep. 89:9–90:14, PEX 4.

68:8–71:5, 81:9–82:4, PEX 4; Young 1st Decl. ¶ 14, PEX 8. Although both Young and Hunsinger testified to their knowledge of this meeting, Gabram did not have any recollection of the meeting. Gabram Dep. 97:12–98:5, DEX 2.

In summary, in addition to the command climate survey response, Young complained about TRADOC's hiring practices directly to Formica, Hunsinger, and Gabram. However, Young admitted that he never complained about the hiring practices directly to Paschal. Young Dep. 96:24–97:10, DEX 8. Additionally, Formica, Hunsinger, and Gabram all testified that that they did not mention Young's complaints to Paschal. Formica Decl. ¶¶ 4–6, DEX 28; Gabram Dep. 114:7–116:19, DEX 2; Hunsinger Dep. 65:21–68:13, PEX 4. When asked, Paschal denied knowing that Young was the author of the critical command climate survey response. Paschal Dep. 152:8–9, 184:22–185:13, DEX 7. However, there is no evidence in the record that Paschal was asked—and therefore did not address—whether he was generally aware of Young's complaints regarding G-3/5/7's hiring policies.

### 3. September Meeting Regarding Command Climate Survey

On September 15, 2015, the Director of the Diversity Office ("Diversity Office Director") at TRADOC briefed Gabram, Moss, Paschal, and Brinkley on the results of the command climate survey (the "September command climate survey meeting").[4] DSUF ¶ 15; Bercaw Decl. ¶ 10, DEX 10; Paschal Dep. 149:19–150:13, DEX 7. The survey revealed "significant morale problems" within G-3/5/7.[5] DSUF ¶ 16. The Diversity Office Director recommended conducting focus

---

[4]     The declaration provided by the Diversity Office Director, Sarah Bercaw, does not indicate that Moss attended the September 15, 2015, meeting; however, Paschal and Moss testified that Moss was present. Paschal Dep. 149:19–150:13, DEX 7; Moss Dep. 35:1–7, DEX 5-1, ECF No. 42-3.

[5]     Young agrees that the command climate survey revealed morale problems within G-3/5/7 but disputes any implication that those problems were caused because of him or TOMA. Pl.'s

groups, or "sensing sessions," to better identify the issues. *Id.* ¶¶ 17–18. Gabram, Paschal, and Brinkley chose two divisions for these follow-up sessions, one of which was TOMA, which reported to Paschal and where Young was Deputy Director. *Id.* ¶ 18. Paschal testified that he recommended TOMA for follow-up sensing sessions because it was one of the larger organizations within G-3/5/7 and he had received information prior to the survey results that there were morale problems within TOMA, including concerns about Young's leadership specifically. *Id.* ¶ 19; Paschal Dep. 179:13–180:7, DEX 7.

### 4. TOMA's Sensing Sessions Results

In October 2015, TRADOC's Diversity Office interviewed TOMA employees regarding employee morale and their perceptions about the leaders of the division. DSUF ¶ 21. These interviews found that TOMA was plagued by "low morale, employees looking to leave TOMA, gender discrimination, lack of trust of leadership, fear of reprisal from leadership, bullying, and 'toxic' leadership." *Id.* ¶ 23 (quoting Johnson Decl. ¶ 7, DEX 14).[6]

After reviewing the findings of the sensing sessions, Gabram decided that a further administrative investigation pursuant to Army Regulation 15-6[7] was unwarranted. Gabram Dep.

---

Mem. at 3. Instead, Young points to findings in the command climate survey report that indicate that perceived favoritism was the top issue identified by the respondents. *Id.*; Summer 2015 Command Climate Survey at 3–4, PEX 16.

[6]     The parties dispute the source or cause of the problems within TOMA. Defendant submits a declaration from one of the two Diversity Office employees who conducted the interviews, who indicated that Young was a "significant source of the problems within TOMA." Johnson Decl. ¶ 7, DEX 14. Young disputes this assertion, citing to Hunsinger's testimony that the poor climate within TOMA could have been due to a number of causes not attributable to Young, including: the merging of TOMA with another division in April of 2015; the division operating with a reduced workforce; high turnover; an inefficient reward and recognition system; employees getting passed over for promotions; and frustration with higher-level TRADOC leadership. Pl's Mem. at 4 (citing Hunsinger Dep. at 20–23; 25; 26–28; 30–33, 35, 43–45; 53–54, PEX 4).

[7]     Army Regulation 15-6 "establishes procedures for conducting preliminary inquiries, administrative investigations, and boards of officers." U.S. Dep't of Army, Reg. 15-6, Procedures

58:7–59:15, PEX 18. On November 3, 2015, Gabram met with Hunsinger and Young to discuss the results of the command climate survey and the follow-up sensing sessions. DSUF ¶ 25. The next day Hunsinger submitted a plan of action to Gabram on behalf of himself and Young indicating how they were going to improve the climate in TOMA. *Id.* ¶ 26; Hunsinger Dep. 42:1–15, PEX 4.

From November 2015 to the beginning of February 2016, no issues regarding TOMA were brought to the attention of G-3/5/7 leadership. DSUF ¶ 27.

5. Decision to Initiate Administrative Investigation into TOMA

On February 18, 2016, an employee within TRADOC's Labor-Management Employee Relations Office informed Paschal that she received a complaint against Young from a TOMA employee identified as C.H. *Id.* ¶ 28. The next day, Paschal, along with a representative from the Employee Relations Office, met with C.H., who complained that Young was a bully to other TOMA employees, treated women differently, and would make jokes with sexual innuendos. *Id.* ¶ 29.

The record is clear that C.H. had difficulties at work and filed several complaints while working at TOMA. Young Dep. 136:15–137:12, PEX 2; Whiddon Dep. 54:1–55:4, PEX 6; Hunsinger Dep. 48:22–51:6, PEX 4. Paschal himself had received two prior complaints from C.H. that he decided not to investigate further, including one about Young. Paschal Dep. 167:1–169:20, 173:13–174:2, PEX 3.

Following his meeting with C.H., Paschal met with the division chiefs working under Young to gather their input. Paschal Dep. 200:9–14, PEX 3. One of the division chiefs Paschal

---

for Administrative Investigations and Boards of Officers § 1-1 (Apr. 1, 2016). The primary function of these probes "is to ascertain facts, document and preserve evidence, and then report the facts and evidence to the approval authority." *Id.* § 1-8.

interviewed—Kelly Whiddon—felt as though Paschal was "pressur[ing] [her] to have an issue with Mr. Young." Whiddon Dep. 40:13–42:8, PEX 6.

After gathering this information, Paschal met with Ulses—who had taken over for Gabram as Deputy Chief of Staff just weeks earlier—to brief him on C.H.'s concerns as well as the information gathered through the command climate survey and TOMA sensing sessions. DSUF ¶ 30. Paschal and Ulses then consulted with the Army's legal department and the decision was made to initiate an administrative investigation into TOMA. *Id.* ¶ 31.

### 6. Administrative Investigation

On February 22, 2016, Lee Grubbs was appointed as the investigating officer. *Id.* ¶ 32. The army's legal department selected Grubbs because he worked outside of TOMA, was a military intelligence officer with experience in analyzing facts and human dynamics, had previous experience leading administrative investigations, and had the time to devote to the investigation because he was about to retire. *Id.* ¶ 35. The purpose of the investigation was to investigate the command climate of TOMA, including assessing organizational effectiveness and inquiring into whether TOMA employees were subject to discrimination, favoritism, or harassment. *Id.* ¶ 33; Memorandum, Appointment of AR 15-6 Investigating Officer (Feb. 22, 2016), DEX 19.

As part of the investigation, Grubbs interviewed thirteen individuals, including TOMA's four division chiefs, who reported directly to Young. DSUF ¶ 37. The investigation report was critical of Young and Hunsinger's leadership of TOMA and characterized Young as a "toxic" leader. *Id.* ¶¶ 38–39; Memorandum, Findings & Recommendations for Army Regulation (AR) 15-6 Investigation ("AR 15-6 Findings & Recommendations"), DEX 21. It recommended that

Young be removed from his Deputy Director position and be required to complete leadership and sensitivity training. AR 15-6 Findings & Recommendations at 7, DEX 21.[8]

### 7. Adverse Employment Actions and EEO Complaint

On March 23, 2016, Paschal issued Young a Letter of Reprimand, placed him on two weeks administrative leave, and reassigned Young to a smaller division within G-3/5/7 where he would supervise fewer employees. DSUF ¶ 42.

On May 27, 2016, Young filed an Equal Employment Opportunity ("EEO") complaint alleging that the March reprimand and reassignment were reprisals for engaging in protected activity and that he was subject to a hostile work environment. *Id.* ¶ 47. Paschal received a copy of this complaint which included Young's preferential hiring criticism from the command climate survey. *Id.* ¶ 53.

---

[8]      Young alleges that Grubbs's investigation was flawed and disputes the investigation's findings. Specifically, Young contends Grubbs intimidated witnesses and misreported information in the investigation report, resulting in a flawed report. Pl.'s Mem. at 5. Two of the division chiefs interviewed by Grubbs—Jeffrey Wells and Kelly Whiddon, both of whom are Black—reported that Grubbs attempted to pressure them into saying negative things about Young. Wells Dep. 73:2–74:4, PEX 12 ("It was almost like I felt like he was trying to threaten me in a certain way during the interview sometimes. And I had to remind him that I'm not in the military anymore. I'm a civilian."); Whiddon Dep. 47:1–48:12, PEX 6 (agreeing with statements that Grubbs was "trying to put words in [Whiddon's] mouth," trying to get Whiddon to "agree with statements about Mr. Young that [she] did not agree with," and pressuring her to say things that she was not "comfortable with"). In his deposition, Wells also disputed many of the comments attributed to him by Grubbs in the summary of his interview, several of which were included in Grubbs's final report. Wells Dep. 65:15–71:19, PEX 12; Memorandum, Record of Verbal Interview of Mr. Jeffrey J. Wells (Feb. 24, 2016), PEX 21; AR 15-6 Findings & Recommendations at 3, 5, DEX 21. Young also disputes the findings of the investigation claiming that the investigation oversampled disgruntled employees and that the final report failed to include employee reviews that were positive of Young's leadership. Pl.'s Mem. at 5; Whiddon Dep. 52:3–54:18, PEX 6; Hunsinger 47:2–51:19, PEX 4; Email from Jeffrey Jennings to David Paschal (Feb. 29, 2016), PEX 29. The Court finds it unnecessary to wade into these disputes for the purposes of summary judgment.

On or about June 22, 2016, Paschal adjusted Young's performance rating for the period of July 1, 2015, to April 7, 2016. *Id.* ¶¶ 44, 46; Evaluation Report, DEX 25. Hunsinger, Young's first level rater, had initially rated Young as excellent in all categories and gave him an overall performance rating of "1" out of five. DSUF ¶ 46. After the administrative investigation was complete, Paschal, as Young's second level rater, then approached Hunsinger to re-examine Young's rating in light of the investigation. *Id.* ¶ 45. Hunsinger refused because he had already discussed Young's evaluation with him. *Id.* Paschal then modified the evaluation, dropping Young's overall rating to a "2" out of five and selecting "No" in response to the question "Includes Excellence in Org Mgt/Ldshp Obj for sup/mgr," which referred to whether his rating included excellence in organization management and leadership. *Id.* ¶ 46. On July 5, 2016, Young was issued the adjusted evaluation rating. Evaluation Report, DEX 25. Young subsequently amended the EEO complaint to include the evaluation downgrade.[9]

8. <u>Disputed Facts</u>

Central to the dispute in this case are Young's complaints generally about G-3/5/7's hiring practices, as well as his written response to the command climate survey. As set forth above, the parties largely agree with the sequence of events and the relevant facts, including the fact that on September 15, 2015, the Diversity Office Director briefed Gabram, Moss, Paschal, and Brinkley on the results of the command climate survey, and provided them with all of the survey responses, which included Young's anonymous complaint that retired white officers, including Paschal and Brinkley, had received preferential hiring. DSUF ¶¶ 13–15; Young 1st Decl. ¶ 13, PEX 8.

---

[9]     Young's amended EEO complaint also alleged several additional adverse actions by Paschal, Brinkley, and others on the TRADOC staff. Memorandum, Notice of Amendment of Formal EEO Complaint (Aug. 1, 2016), at 161, DEX 27. Those alleged adverse actions were not included in the instant Complaint and need not be addressed by the Court.

However, the parties dispute several key facts and inferences. Specifically, the parties disagree as to whether the undisputed facts establish that Paschal knew that Young had complained—either generally or specifically in the command climate survey—prior to recommending the administrative investigation and whether that recommendation was driven by retaliatory animus. Central to this dispute are conflicting accounts provided by Hunsinger, Young, and Moss regarding the September command climate survey meeting between Gabram, Paschal, Brinkley, and Moss.

In his deposition, Moss testified that he attended the September command climate survey meeting in which the results of the survey were discussed. Moss Dep. 35:1–7, DEX 5-1, ECF No. 42-3. He testified that both Brinkley and Paschal "were pretty frustrated" with the survey results. Moss Dep. 41:15–42:3, DEX 5. However, when asked, Moss testified that no one brought up the fact that Young had submitted a comment about Brinkley and Paschal, or any individual comments at all. *Id.* 39:4–40:12. Moss testified that neither Brinkley nor Paschal brought up disciplinary action against Young or indicated that they wanted to go after him in the meeting. *Id.* 41:7–14. Moss acknowledged however, that Young was discussed at another meeting at some point after the command climate survey, in which Brinkley may have said that Young should not have been hired for the position of Deputy Director of TOMA. *Id.* 43:11–45:3. However, when asked whether he was "ever in a meeting where Paschal or Brinkley indicated they wanted to go after Mr. Young or retaliate against him?" Moss replied, "No, sir, they didn't." *Id.* 45:22–46:4.

In his deposition, Hunsinger testified that he talked to Moss in September or October about a meeting between Gabram, Paschal, and Brinkley in which G-3/5/7's hiring policies were discussed. Hunsinger Dep. 82:5–84:7, PEX 4. When asked whether he had any knowledge of Gabram sharing Young's complaints regarding hiring with his senior team (Paschal and Brinkley), Hunsinger responded:

> . . . [Moss] came to me later and told me that there was a discussion. Wasn't sure what was going to happen or what was going to come of it. But he said that there was a discussion about it, and they were going to take a look at it, but that was it.

*Id.* 82:5–83:6. When asked "What else did [Moss] tell you about that meeting?" Hunsinger replied,

> Other than that they were going to look at it. *That [Young's] name was mentioned as, you know, not being happy about it.* I don't know if they were going to do a study or do an investigation. But they were going to take a look at it and take steps further to figure out whether or not this is going on. That's all he said to me.
>
> I'm not – I'm a little fuzzy on the specifics, but I do remember them saying that they were going to look at it and figure out whether or not they have a problem.

*Id.* 83:7–19 (emphasis added).

However, when pressed in the deposition later on, Hunsinger testified that according to Moss, the conversation between Gabram, Brinkley, and Paschal "wasn't specifically about Mr. Young, although his [command climate survey response] [was] in there" and that the response was not specifically attributed to Young. Hunsinger Dep. 125:19–126:4; 127:7–15, DEX 4-1.

Relatedly, Young also proffers testimony regarding a conversation he had with Moss about the September command climate survey in March 2016. According to Young, shortly after receiving the Letter of Reprimand, he received a call from Moss who provided him with the following information:

> SGM Moss informed me that he had just heard from my supervisor (Colonel Hunsinger) that I received a letter of reprimand. SGM Moss told me that the letter of reprimand was "retaliation" and that I "should fight it." SGM Moss said that he attended a Command Climate survey meeting with BG Gabram, Mr. Brinkley, and Mr. Paschal, and that during that meeting my name was mentioned by Mr. Brinkley and Mr. Paschal. SGM Moss informed me that during the meeting Mr. Paschal and Mr. Brinkley indicated that they wanted to "punish" me "right then" but that BG Gabram would not allow it.

Young 2d Decl. ¶¶ 3–5, PEX 28.[10]

Much of Moss's testimony, set forth above, conflicts with Young's and Hunsinger's accounts; however, Moss does provide some indication that there was conflict between Paschal, Brinkley, and Young. When asked whether Gabram ever expressed concern that Paschal or Brinkley "had an axe to grind" against Mr. Young, Moss replied, "Oh, Lord Jesus. I don't know the exact words that he stated, sir. . . . I think General Gabram had some concerns. Let's say it like that." Moss Dep. 46:21–47:11, DEX 5. According to Moss it appeared as though Gabram had to reiterate to Brinkley and Paschal several times his decision regarding the appropriate path forward after the September command climate meeting and sensing sessions. *Id.* 47:19–48:6 ([N]ormally . . . you tell your staff how you're moving forward, and that's how we moved forward. It seemed like [Gabram] had to do it on a number of occasions."); *Id.* 49:18–22 ("[Gabram] just stuck to his guns as far as how were going to move forward.").

The Secretary objects to both Young and Hunsinger's accounts of what Moss told them as inadmissible hearsay. The Court addresses that objection *infra*, Parts IV.B–C, and concludes that Hunsinger's account is admissible, while Young's account is not.

### B. Procedural History

Young commenced this action on July 2, 2021. Compl., ECF No. 1. The parties engaged in discovery and the Secretary then filed her Motion for Summary Judgment on August 19, 2022. Mot. Summ. J., ECF No. 32; Def.'s Mem. Supp. ("Def.'s Mem."), ECF No. 33. The Court then suspended all other deadlines pending resolution of the Secretary's motion. Order at 1, ECF No.

---

[10]   The Secretary does not dispute that the March 25, 2016 call took place; however, the Secretary argues that Young's account of the call is inadmissible hearsay and that Moss's deposition testimony contradicts many of Young's assertions. Def.'s Reply at 3–4.

39. Young filed his response on September 6, 2022, Pl.'s Mem. Opp'n ("Pl.'s Mem."), ECF No. 40, and the Secretary filed her reply on September 13, 2022, Reply Supp. Def.'s Mot. Summ. J. ("Def.'s Reply"), ECF No. 42. The matter is now ripe for review.[11]

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a claim or defense, or part of a claim or defense. Fed. R. Civ. P. 56(a). The district court will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is material if "its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012) (citations omitted).

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact. *Wai Man Tom*, 980 F.3d at 1037 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The nonmoving party must then establish that specific, material facts exist which would give rise to a genuine issue. *Id.* In reaching its decision, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

---

[11]     After examining the briefs and the record, the Court determines that because the facts and legal contentions are adequately presented and oral argument would not aid in the decisional process, a hearing is unnecessary. Fed. R. Civ. P. 78(b); E.D. Va. Loc. R. 7(J).

### III. DISCUSSION

Title VII's federal-sector provision mandates that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Although the federal-sector provision does not explicitly prohibit retaliation, the United States Court of Appeals for the Fourth Circuit has held that the federal-sector provision incorporates private-sector protections against retaliation. *See Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011).

A plaintiff can prove that an employer acted with discriminatory or retaliatory intent through either direct evidence of discriminatory intent or by establishing discriminatory intent by inference. *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (citations omitted). Direct evidence is "conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (internal quotation marks and citation omitted). Because Young does not provide direct evidence of discriminatory conduct, he must prove his claim circumstantially by inference. Traditionally, his claim would proceed under the *McDonnell Douglas*[12] burden-shifting framework. *Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 991 (E.D. Va. 2017) (applying the *McDonnell Douglas* test to Title VII claims), *aff'd*, 711 F. App'x 174 (4th Cir. 2018).

Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of retaliation: "(1) plaintiff engaged in protected activity . . .; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action." *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (citation omitted); *see Kitlinski v. U.S.*

---

[12]     *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Dep't of Just.*, 994 F.3d 224, 232 (4th Cir. 2021). An employee engages in protected activity when he has a reasonable belief that his employer is engaged in an employment practice unlawful under Title VII and he communicates that belief to his employer. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). Additionally, to establish causation, the plaintiff must demonstrate that the decisionmaker who took the adverse actions had actual knowledge of plaintiff's protected activity. *Roberts v. Glenn Indus. Grp., Inc.* 998 F.3d 111, 125 (4th Cir. 2021).

If Plaintiff meets his burden, the Secretary must then "articulate a non-discriminatory or non-retaliatory reason for the adverse action." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (citations omitted). Finally, if the Secretary meets its burden of production, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Id.* "The final pretext inquiry merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (internal quotation marks and citation omitted); *see also Reeves*, 530 U.S. at 143 (a Title VII plaintiff must prove an employer's reasons "were not its true reasons" or were "unworthy of credence").

The United States Supreme Court, in *Babb v. Wilkie*, recently clarified the causation requirement in federal-sector retaliation claims for claims brought under the Age Discrimination in Employment Act (ADEA). 140 S. Ct. 1168 (2020). Although *Babb* still requires that a plaintiff must establish all three of the elements of a prima facie case of retaliation (protected activity, adverse action, and causal connection), *Babb* lessened the burden on plaintiffs to establish causation. *See Babb*, 140 S. Ct. at 1174 ("age must be the but-for cause of *differential treatment*,

16

not that age must be a but-for cause of the *ultimate decision*" (emphasis in original)); *Lewis v. Sec'y of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at \*10 (11th Cir. June 30, 2022) (explaining that post-*Babb* "a federal sector employee alleging Title VII and ADEA claims must still establish a prima facie case that a decision was not 'made free from any discrimination'"). The opinion also called into question whether the subsequent burden-shifting steps of *McDonnell Douglas* continue to apply to federal sector retaliation claims. *See Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1204 (11th Cir. 2021) ("Without quite saying as much, then, it seems that the Supreme Court accepted Babb's argument 'that the District Court should not have used the *McDonnell Douglas* framework.'" (quoting *Babb*, 140 S. Ct. at 1172)).

The Court will first address the Secretary's first two grounds for summary judgment, which are unaffected by *Babb*: whether Young engaged in protected activity prior to the March reprimand and reassignment, and whether the person responsible for the challenged personnel actions—Paschal—knew of Young's protected activity prior to taking those actions. Then the Court will consider causation in light of *Babb*. Specifically, whether the March reprimand and reassignment and July evaluation downgrade were the result of retaliatory animus, and whether Young is entitled to reinstatement or other monetary and compensatory damages.[13] Mot. Summ. J., ECF No. 32.

## IV. ANALYSIS

The parties agree that both the March reprimand and reassignment and the July evaluation downgrade satisfy the adverse employment action element of a retaliation claim. As to the former,

---

[13]     The Secretary does not seek to establish at summary judgment that a non-retaliatory reason existed for the adverse action, which, under the *McDonnell Douglas* framework, would shift the burden to Young to show pretext. *See Guessous*, 828 F.3d at 216. Thus, the Court need not consider the impact of the *Babb* decision on the subsequent burden-shifting steps set forth in *McDonnell Douglas*.

the March reprimand and reassignment, the parties dispute whether Young engaged in a protected activity prior to this adverse action, and even if Young engaged in protected activity, whether Young can establish the necessary causal connection between the protected activity and adverse action. Mot. Summ. J., ECF No. 32. As to the latter, the July evaluation downgrade, the Secretary does not challenge that Plaintiff engaged in a protected activity prior to this adverse action, but similarly argues that Young cannot establish the necessary causal connection between the protected activity and adverse action. *Id.* The Secretary also asserts that even if Young can establish the necessary causal connection for liability, he cannot establish damages. *Id.* The Court will address each issue in turn.

### A. Protected Activity

The Secretary argues that Young did not engage in protected activity prior to the March reprimand and reassignment. Def.'s Mem. at 16–19.

An employee engages in a protected activity when he "oppose[s] any practice made an unlawful employment practice [by Title VII] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *see Bonds*, 629 F.3d at 384 (holding that the federal-sector provision under 42 U.S.C. § 2000e-16(a) incorporated the retaliation protections contained in § 2000e-3). Title VII's protection from retaliation is necessarily broader than even the protection afforded to victims of discrimination themselves because enforcement of Title VII relies on employees' cooperation to file complaints and serve as witnesses. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–67 (2006) ("[E]ffective enforcement [can] . . . only be expected if employees [feel] free to approach officials with their grievances." (citations omitted)). Accordingly, "the threshold for oppositional conduct is not onerous." *DeMasters*, 796 F.3d at 417.

An employee engages in oppositional activity when he communicates to his employer his belief that the employer has engaged, or is engaging, in a discriminatory employment practice. *See id.* (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)). The employee need not engage in formal grievance procedures, "voicing one's opinions in order to bring attention to an employer's discriminatory activities" is sufficient. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing *Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir.1981)). Likewise, "the anti-retaliation provision protects employees even when they complain of actions that are not actually unlawful under Title VII." *Strothers*, 895 F.3d at 327 (citing *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc)). An employee's oppositional activity is protected if, at the time of his opposition, he had an "objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress." *Id.*

Here, Young complained numerous times to numerous individuals that G-3/5/7 had a purported policy of hiring and promoting retired military officers, a practice that Young believed favored white men at the expense of non-white and women candidates. As described above, Young complained to his second-line supervisor at the time, Formica, in 2014; to his direct supervisor, Hunsinger on multiple occasions, including when he responded to the command climate survey; and to then-Brigadier General Gabram in September 2015. Formica Decl. ¶¶ 4–6, DEX 28; Gabram Dep. 97:1–7, 114:7–116:19, DEX 2; Hunsinger Dep. 65:21–67:9, PEX 4; Young Dep. 97:23–101:21, PEX 2. The Court readily concludes that Young's complaints, while not through a formal grievance procedure, are more than sufficient to establish that Young communicated his belief that G-3/5/7 was engaging in a discriminatory employment practice. *Laughlin*, 149 F.3d at 259.

The Court must also consider whether Young had an objectively reasonable belief that a Title VII violation was occurring. *Strothers*, 895 F.3d at 327. Here, Young argues that he complained "that senior leadership had a practice of gifting senior jobs to white officers, which discriminated against women and minorities." Pl.'s Mem. at 12. The Secretary characterizes this complaint as raising a claim of disparate impact. Def.'s Mem. at 17. Young resists this characterization but does not identify any other characterization. Pl.'s Mem. at 11. Having considered Young's allegations, the Court will consider whether Young had a reasonable basis to oppose what he perceived to be a hiring policy that resulted in discrimination against non-white and women candidates. In so doing, the Court will consider the elements of a disparate impact claim in light of what Young knew at the time. *See Strothers*, 895 F.3d at 328 ("To determine whether Strothers had a reasonable basis to oppose what she perceived as a hostile environment, we examine the elements of a hostile environment claim in light of what she knew.").

"To establish a prima facie case of disparate impact discrimination under Title VII, a plaintiff must 'show that the facially neutral employment practice had a significantly discriminatory impact.'" *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005) (quoting *Walls v. City of Petersburg*, 895 F.2d 188, 191 (4th Cir. 1990)). A plaintiff may rely on substantial statistical evidence to raise an inference of causation when bringing a disparate impact claim. *Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 994–95 (1988) ("[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.").

The Secretary argues that the evidence available to Young at the time cannot support an objectively reasonable belief that a practice existed that prioritized the hiring of retired military

officers. Def.'s Mem. at 18–19. The Secretary further asserts that even if such a practice existed, Plaintiff could not have held an objectively reasonable belief that the practice had a disparate impact on female and non-white candidates because he lacked information about the applicant pool. *Id.* Young disagrees, arguing that, as a part of management, he had personal knowledge of representative incidents reflecting the practice over an eight-year period, he personally observed the visible lack of diversity among G-3/5/7 management, and that his observations were shared by others. Pl.'s Mem. at 12–13.

Young began working in TOMA in 2007. DSUF ¶ 10. Between 2008 and 2015, Young reported observing a hiring process within G-3/5/7 that was neither open nor competitive. Young 1st Decl. ¶ 3, PEX 8. According to Young, hiring practices tended to favor retired Army officers at the O-6 level or higher. *Id.* ¶ 2. Young provided thirteen examples of what he considered improper hiring or promotions of white, male, retired colonels. *Id.* ¶ 4 (Table 1). Young also testified he observed Paschal attempting to intervene in a hiring that Young was conducting in favor of a white, male, retired colonel. *Id.*; Young Dep. 48:7–49:16, PEX 2.

In addition to his personal observations, Young points to the fact that his view was shared by other employees within G-3/5/7. Pl.'s Mem. at 13; *see also* Paschal Dep. 136:2–4, PEX 3 ("I've heard both terms: no colonel left behind, brass ceiling. It's not an uncommon term that has been used by the civilian workforce."). In addition to other employees sharing Young's view, senior leadership was actively aware that such criticism existed at the time. Paschal Dep. 128:16–130:3, PEX 3 ("I think there's a myth or a legend that the Army only hires retired white colonels and that there's a ceiling for those civilian employees."); Hunsinger Dep. 79:13–22, PEX 4 ("I started hearing from other people that a lot of the senior positions go to the retired Colonels."); Moss Dep. 16:20–17:11, PEX 11 (describing overhearing employees other than Young mention "No Colonel

21

Left Behind"). The command climate survey also revealed that perceived favoritism in job opportunities was a top concern of employees. TRADOC Climate Survey at 370–71, DEX 13; Paschal Dep. 150:21–151:3, DEX 7.

To show that such policy disparately impacted non-white and female applicants, Young submits demographic data from the Army showing that O-6 level officers—the alleged prioritized group—are largely male and white. Young 1st Decl. ¶¶ 6–7, PEX 8 (showing that in 2014 and 2015 approximately eighty-nine percent of O-6 officers were male, and eighty-three percent were white). Additionally, Young alleges that, G-3/5/7's leadership was also disproportionally white and male. Young 1st Decl. ¶¶ 8–9, PEX 8 (showing that ninety-six percent of G-3/5/7 leadership was white, and eighty-five percent was male). Other employees concurred. Whiddon agreed that the hiring practices in the G-3/5/7 disadvantaged women and minority candidates, Whiddon Dep. 34:22–37:12, PEX 6, and Hunsinger testified that the G-3/5/7 leadership noticeably lacked diversity during the time he worked there, Hunsinger Dep. 66:20–67:3, DEX 4. While these facts and statistics may be insufficient to *sustain* a disparate impact claim, given the broad remedial purposes of the anti-retaliation provision of Title VII, *see Boyer-Liberto*, 786 F.3d at 283, the evidence is sufficient to show that Young had an *objectively reasonable belief* that a policy prioritizing hiring retired high-level Army officers existed and resulted in the exclusion of non-white and female applicants.

Accordingly, the Court finds that a reasonable jury could determine that Young engaged in protected oppositional activity prior to the March reprimand and reassignment.

## B. Actual Knowledge

The Secretary argues that Young cannot demonstrate that Paschal, the relevant decision maker, knew of Young's protected activity prior to the March 23, 2016, adverse actions.[14] Def.'s Mem. 20–22.

To prevail on a Title VII retaliation claim, the plaintiff must establish that the decisionmaker who took the adverse actions had actual knowledge of plaintiff's protected activity. *Roberts*, 998 F.3d at 125. When the "relevant decisionmaker is unaware of any prior complaints, a plaintiff 'cannot establish the necessary causal connection between'" his protected activity and the adverse employment action. *Id.* at 124 (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). Proving actual knowledge "requires more evidence than mere curious timing coupled with speculative theories." *Id.* at 126 (quoting *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017)). To survive summary judgment, Young must present either direct or circumstantial evidence sufficient to create a genuine question of fact as to whether Paschal knew of his prior complaints about G-3/5/7's hiring practices. *Id.* at 124.

Young has proffered both direct and circumstantial evidence of Paschal's knowledge of Young's protected activity. Young's direct evidence of Paschal's knowledge consists of Hunsinger's account of his conversation with Moss in which Moss told Hunsinger that "[Young's] name was mentioned as . . . not being happy about [the hiring practices]," at a meeting that Paschal attended. Hunsinger Dep. 82:5–84:7, PEX 4. The Secretary objects to this testimony as

---

[14]     The Secretary does not appear to dispute that Paschal knew of Young's protected activities prior to the July evaluation downgrade. Rightfully so, Paschal stated that he became aware that Young was the author of the command climate survey response critical of G-3/5/7's hiring policies when he received a copy of the EEO Complaint on May 27, 2016. Paschal Dep. 185:9–13, DEX 7.

inadmissible hearsay.[15] Def.'s Reply at 3–4. However, Moss's statement to Hunsinger is admissible to show Paschal's knowledge that Young engaged in protected activity.[16] *See* Fed. R. Evid. 801(d)(2)(D).

In addition to this direct evidence, Young also provides circumstantial evidence to establish Paschal's knowledge. It is undisputed that over a two-year period, Young complained to numerous individuals within G-3/5/7 about hiring practices, specifically to Formica (Paschal's predecessor), Gabram (Paschal's superior), and "many times" to Hunsinger (Young's direct superior). Formica

---

[15]     The Secretary argues that even if Hunsinger's testimony is admissible, the testimony does not support direct evidence of Paschal's knowledge because it is internally contradictory and Moss disputes much of what Hunsinger recounts. Def.'s Reply at 3. However, such arguments speak to the credibility of witnesses and must be left to the factfinder.

[16]     Hunsinger's testimony about what Moss purportedly told him, which is an out of court statement, contains a separate, nested out of court statement, specifically that another unidentified individual mentioned Young's name as "not being happy [about hiring practices]." Thus, the Court must consider whether both statements are admissible. Hunsinger's recounting of Moss's comment is not hearsay because it is a statement of a party opponent. A statement is not hearsay when it is "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).

Moss served as the Senior Enlisted Advisor to Gabram beginning in March 2014 through February 2016. Moss Dep. 9:8–10:18, DEX 5. As part of that employment, Moss "served as eyes and ears for [Gabram]" and coordinated regularly with G-3/5/7 leadership. Moss Dep. 11:10–12:2, DEX 5; *see* Hunsinger Dep. 85:13–22, PEX 4 ("[A]ny good Sergeant Major is going to go and talk with the leadership in an organization to kind of give them feedback on what's going on and to help them drive the organization in the right direction."). Accordingly, Hunsinger's account of what Moss told him is admissible because Moss was working within G-3/5/7 at that time and his discussion with Hunsinger was related to a matter within his employment relationship (i.e., discussing a meeting he had just attended).

The underlying statement, that Young's name was mentioned as "not being happy [about hiring practices]" is not hearsay because, unlike Moss's statement, it is not being offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) (defining "hearsay" as a statement that that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"). The underlying statement is not being offered to establish that Young was, in fact, not happy about the hiring practices. Instead, it is offered to show that Paschal had knowledge that Young had complained about such practices. Therefore, the statement is admissible.

Decl. ¶¶ 4–6, DEX 28; Gabram Dep. 114:7–116:19, DEX 2; Hunsinger Dep. 65:21–67:9, PEX 4. Young proffers that "[he] had the reputation" for complaining to leadership about "the hiring processes being biased, and what [he] thought was illegal." Young Dep. 111:18–112:10, DEX 8. Additionally, Young and Hunsinger recount a conflict between Young and Paschal where Paschal attempted to intervene in favor of his preferred candidate in a hiring conducted by Young. Young Dep. 48:7–49:16, PEX 2; Hunsinger Dep. 68:8–71:5, 81:9–82:4, PEX 4. Young argues that these facts, taken together with the "small, close-knit command" of G-3/5/7 are sufficient to establish the fact that Paschal knew about Young's opinion on the matter even if he never complained directly to Paschal himself. Pl.'s Mem at 14–17; Pl.'s Objs. And Answers Def.'s First Set Interrog. No. 6, PEX 10. Young's testimony about the tendency of individuals within G-3/5/7 to share information was echoed by Moss, who, in explaining how he knew Young had been removed from his position, testified that "everybody talks. That's what they do." Moss Dep. 54:1–12, DEX 5. Finally, while Paschal specifically denies being able to attribute the command climate survey response to Young, there is no evidence in the record that Paschal was asked—and therefore did not address—whether he was generally aware of Young's complaints regarding G-3/5/7 hiring policies. Paschal Dep. 152:8–13, 184:22–185:13, DEX 7.

The Secretary argues that Young's assertion that Paschal knew of his complaints due to Young's reputation for complaining and G-3/5/7's close-knit nature is "unbridled speculation," given that there are several hundred individuals within G-3/5/7. Def's Reply at 11 & n.6. But Young relies on more than just mere assertions. First, Moss's statement to Hunsinger that Young was mentioned as "not being happy" about the hiring practices, in a meeting where Paschal was present, creates a material dispute of fact as to Paschal's knowledge. Second, the record also contains evidence regarding the numerous people surrounding Paschal, including other

members of leadership, that knew of Young's complaints. Moss also echoed Young's statement that employees within G-3/5/7 "talk." These additional objective facts, although few, provide circumstantial evidence that Paschal knew of Young's complaints generally, even if Young did not complain directly to him. Considering the direct and circumstantial evidence together, and drawing all reasonable inferences in favor of Young, a reasonable jury could conclude that Paschal had actual knowledge of Young's complaints about the command's hiring policies prior to March 23, 2016.

### C. Causal Connection

Plaintiff must also show a causal link between the protected activity and his adverse employment action to satisfy the third element of his prima facie claim of retaliation. In federal-sector cases pre-*Babb*, this required a plaintiff to establish but-for causation between the protected activity and the adverse employment action itself. *See Staley v. Gruenberg*, 575 F. App'x 153, 155–56 (4th Cir. 2014). However, the showing required to establish prima facie retaliation was not onerous. *See Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) ("Very little evidence of a causal connection is required to establish a prima facie case of retaliation" (cleaned up)). For example, a plaintiff could establish prima facie causation by offering facts that suggest that the adverse action occurred because of the protected activity, or by establishing that the adverse act bears sufficient temporal proximity to the protected activity. *Roberts*, 998 F.3d at 123 (citations omitted). The Supreme Court's decision in *Babb* altered this causal requirement.

In *Babb*, the Supreme Court analyzed the federal-sector provision of the ADEA and found that the plain language of the statute—specifically, that the personnel action be "free from any discrimination"—required that personnel actions be made "in a way that is not tainted by differential treatment based on age." *Babb*, 140 S. Ct. at 1173–74. Accordingly, to establish

liability under the provision, a plaintiff needs to demonstrate that "age must be the but-for cause of *differential treatment*, not that age must be a but-for cause of *the ultimate decision*." *Id.* at 1174 (emphasis in original).

The Fourth Circuit has yet to apply *Babb* to an ADEA or Title VII case.[17] However, the United States Court of Appeals for the Seventh Circuit's analysis in *Huff v. Buttigieg* is instructive. 42 F.4th 638, 647–50 (7th Cir. 2022) In *Huff*, a Federal Aviation Administration employee alleged that the administration violated Title VII by retaliating against her for filing a religious discrimination complaint. *Huff*, 42 F.4th at 640. After analyzing *Babb*, the Seventh Circuit explained that to succeed in a federal-sector retaliation case, "the plaintiff's evidence—whether direct, circumstantial, or both—must permit the factfinder to conclude the employer's retaliatory animus *played a part* in an adverse employment action." *Id.* at 647 (emphasis added). The court then analyzed whether a link in the causal chain leading to the termination of the plaintiff, in that

---

[17]     Two other circuit courts—the United States Courts of Appeals for the Seventh and Eleventh Circuits—have both concluded that *Babb* does apply in Title VII cases. *See Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1199–200 (11th Cir. 2021) ("Because the relevant statutory provisions of the ADEA and Title VII are essentially identical, the *Babb* Court's interpretation of the ADEA's phrase 'personnel actions . . . shall be made free from any discrimination based on' must control here, too."); *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022) ("The federal-sector provisions in the ADEA and Title VII are identical, so we have no trouble concluding, as did the Eleventh Circuit, that *Babb*'s causation standard applies equally to 42 U.S.C. § 2000e-16."); *see also Babb*, 140 S. Ct. at 1181 (Thomas J., dissenting) ("Because § 633a(a)'s language also appears in the federal-sector provision of Title VII, 42 U.S.C. § 2000e–16(a), the Court's rule presumably applies to claims alleging discrimination based on sex, race, religion, color, and national origin as well."). The parties likewise agree that *Babb* applies to Young's Title VII claim. Def.'s Mem. at 14–15; Pl.'s Mem. at 6–10.

This Court concurs. The relevant statutory provisions in the ADEA and Title VII are nearly identical. *Compare* 29 U.S.C. § 633a(a), *with* 42 U.S.C. § 2000e-16(a). The Supreme Court has explicitly recognized this parallel, stating that "[t]he ADEA federal-sector provision was patterned 'directly after' Title VII's federal-sector discrimination ban." *Gomez-Perez v. Potter*, 553 U.S. 474, 487 (2008) (citing *Lehman v. Nakshian*, 453 U.S. 156, 167 n.15 (1981)). Accordingly, *Babb*'s textual reasoning applies with equal force to Title VII's federal-sector provision.

case the issuance of a noncompliance memo, was driven by retaliatory animus. *Id.* at 647–50. In reaching the conclusion that the noncompliance memo was driven by retaliatory animus, the court relied on "[c]ommon categories of circumstantial evidence" that indicate animus, such as suspicious timing and pretext. *Id.* at 647.

The Court will follow this approach and assess whether the direct or circumstantial evidence contained in the record would permit a reasonable jury to conclude that decisions in the causal chain that led to the March reprimand and reassignment and July evaluation downgrade were driven by retaliatory animus.

### 1. Connection between Young's protected activity and March reprimand and reassignment

The Secretary argues that Young cannot establish causation between his protected activity and the March reprimand and reassignment. Def.'s Mem. at 22–26.

Young attempts to submit direct evidence of retaliatory intent by relying on Moss's statement to him that Brinkley and Paschal indicated that they wanted to "punish" Young for his command climate survey response and that the Letter of Reprimand was "retaliation." Young 2d Decl. ¶¶ 3–5, PEX 28. The Secretary objects to this evidence as inadmissible hearsay. Def.'s Reply at 3–4. The Secretary is correct. At the time he allegedly made these comments to Young, Moss had retired and was no longer working for the Secretary. Moss Dep. 9:8–10:17, DEX 5. For this reason, the statement is not admissible as a statement of a party opponent or under any of the other grounds identified by Young in his brief.[18] Because Moss himself does not testify to this

---

[18]     Moss retired in February of 2016. Moss Dep. 9:8–10:17, DEX 5. As a result, Young's account of the call he received from Moss on March 25, 2016, is not admissible because Moss was no longer serving as an agent or employee of the Defendant when he made the alleged statement. *See* Fed. R. Evid. 801(d)(2)(D).

    Young also argues that Moss's statements to Young are admissible "to show Defendant's corporate state of mind." Pl.'s Mem. at 27 n.15 (citing *Bhaya v. Westinghouse Elec. Corp.*, 709 F.

conversation and Young has not identified an admissible form of this evidence, it is inadmissible evidence to support Young's opposition to the Secretary's motion for summary judgment. *See Jones v. W. Tidewater Reg'l Jail*, 187 F. Supp. 3d 648, 653–54 (E.D. Va. 2016) (explaining that when the admissibility of evidence is challenged at summary judgment it is the burden of the proponent of that evidence to either establish that the evidence is admissible or proffer how such facts could be presented in admissible form at trial).

In the absence of direct evidence, a plaintiff may establish a causal connection between protected activity and adverse actions using two routes. First, the plaintiff can establish temporal proximity between the protected actions and the adverse action. *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 784 (4th Cir. 2021) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). Temporal proximity alone may establish causation when the proximity is "very close" in time. *Clark Cnty. Sch. Dist.*, 532 U.S. at 273–74 (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). When the adverse action occurs more than two and a half months after the protected activity, an inference of causation is significantly weakened. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003). However, the length of time does not undercut an inference of causation when the subsequent adverse action occurs at a "natural decision point." *Id.* (discharging a teacher at the end of an academic year did not defeat an inference of causation despite the fact that the firing occurred two months and two weeks after notice of the plaintiff's EEO complaint). Second, when temporal proximity alone may be

---

Supp. 600, 603 (E.D. Pa. 1989)). However, this argument is inapplicable because Plaintiff is seeking to admit the statement for the truth of the matter asserted not to show its impact on the listener. Additionally, Moss's statements do not qualify as a present sense impression under Federal Rule of Evidence 803(1) because Moss is not describing or explaining an event while perceiving it or directly after, but instead is allegedly recounting to Young what happened at a meeting that occurred months prior. *See United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997).

insufficient, other evidence of retaliatory animus occurring in the intervening period may support a finding of causation. *Johnson*, 839 F. App'x at 784 (citing *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)).

There is a four-month gap between when Paschal allegedly became aware of Young's protected activity and when he recommended that Ulses launch the administrative investigation, which eventually led to the March reprimand and reassignment. Hunsinger Dep. 82:5–84:7, PEX 4; DSUF ¶ 32. Generally, such a gap would greatly limit any inference of causation. *See King*, 328 F.3d at 151 n.5. However, Young produces additional evidence—when viewed in the light most favorable to him—that would allow a reasonable jury to infer that Paschal harbored retaliatory animus and retaliated against Young as soon as he had the opportunity, once Ulses replaced Gabram.

First, it is apparent from the record that after reviewing the results of the command climate survey and sensing sessions, Gabram concluded that no further investigation into TOMA or Young was warranted. Gabram Dep. 58:7–59:15, PEX 18. Instead, he verbally counseled Young and Hunsinger and required that they submit a plan of action to improve the command climate. DSUF ¶ 25. According to Moss, it also appeared as though Gabram had "some concerns" that Brinkley and Paschal may have had an "axe to grind" with Young and had to reiterate to Brinkley and Paschal several times his decisions regarding the appropriate path forward after the results of the command climate survey. Moss Dep. 46:21– 48:6, DEX 5.

Next, within two weeks of Ulses taking over for Gabram, an administrative investigation was launched into TOMA and Young. The timing of this decision, soon after a leadership change where the prior leader, Gabram, was against instituting an administrative investigation, does raise an inference of retaliatory animus. Additionally, this inference of retaliation is further supported

by Whiddon's testimony that she felt as though Paschal was "pressur[ing] [her] to have an issue with Mr. Young" when he interviewed her immediately prior to launching the investigation. Whiddon Dep. 40:13–42:8, PEX 6.

The Secretary argues that the administrative investigation was initiated due to a legitimate reason, the complaint that C.H. filed against Young. Def.'s Mem. at 25–26. However, Young proffers evidence related to C.H.'s complaint that Young argues calls into question Paschal's motivation for instituting the investigation. Pl.'s Mem. at 4–5, 19–20. Specifically, Young points to the fact that Paschal previously decided not to investigate a similar complaint by C.H. against Young and that, according to Paschal's own testimony, launching an administrative investigation into an entire division off a single complaint was unusual. Paschal Dep. 168:1–169:19, 206:12–210:4, PEX 3. Paschal testified that he viewed C.H.'s first complaint as credible but decided not to investigate it at the time, instead opting to talk to other members of TOMA who reported issues. *Id.* 168:17–170:2. Paschal's motivations for instituting the investigation into C.H.'s complaint, and the related factual circumstances, are disputed. As such, a reasonable jury could view Paschal's decision to initiate the administrative investigation as either driven by retaliatory animus or by legitimate concerns about Young's workplace behavior.

Taken together, (1) Gabram's concerns about Paschal and Brinkley and his decision not to institute an administrative investigation, (2) the suspect timing of that investigation being launched shortly after Gabram's departure, and (3) Paschal's pressuring Whiddon to have an issue with Young, are sufficient to permit a reasonable jury to conclude that the decision to initiate the administration investigation was driven by retaliatory animus. The Secretary's evidence regarding a legitimate business reason does not change that conclusion, given the disputes of fact surrounding the administrative investigation. Additionally, because the administrative investigation is the

31

Secretary's purported justification for the March reprimand and reassignment, demonstrating that the investigation was driven by retaliatory animus is sufficient to establish that retaliation "tainted" the ultimate employment decision. *See* Def.'s Mem. at 23 ("The AR 15-6 investigation results were the reason for the March 23 actions."); *Babb*, 140 S. Ct. at 1174 ("If . . . discrimination plays any part in the way a decision is made, then the decision is not made in a way that is untainted by such discrimination.").

### 2. Connection between Young's protected activity and July evaluation downgrade

Second, the Secretary argues that Young cannot establish causation between his protected activity and the July evaluation downgrade.

This presents a more straightforward analysis. Young participated in protected activity again when he filed his EEO complaint on May 27, 2016. DSUF ¶ 47. Approximately one month later, Paschal, who had knowledge of the EEO complaint, approached Hunsinger to re-examine Young's rating in light of the administrative investigation. *Id.* ¶¶ 45, 53. Hunsinger refused to do so. *Id.* ¶ 45. Paschal then modified the evaluation as the second level rater. *Id.* ¶¶ 44, 46. Such temporal proximity weighs in favor of a causal connection between Young's protected activity and his July evaluation downgrade. *See King*, 328 F.3d at 151 n.5.

The Secretary attempts to justify the July evaluation downgrade by arguing that it was a further result of the administrative investigation. However, due to the reasons discussed in Part IV.C.1, a reasonable jury could conclude that the investigation was initiated due to retaliatory animus and, as a result, all decisions stemming from that investigation were "tainted." *Babb*, 140 S. Ct. at 1174.

Accordingly, there is sufficient evidence from which a reasonable jury could conclude that the July evaluation downgrade was a result of retaliatory animus.

3. Monetary Damages

Lastly, the Secretary argues that, even if Young can establish liability, he cannot establish that he is entitled to damages such as reinstatement, back pay, or compensatory damages. Def.'s Mem. at 30.

The Supreme Court in *Babb* explained that while direct but-for causation between the protected activity and the adverse action was not required to establish liability, but-for causation remained important to determining the appropriate remedy. *Babb*, 140 S. Ct. at 1177 ("It is bedrock law that 'requested relief' must 'redress the alleged injury.'") (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). Thus, to obtain certain remedies related to termination, such as reinstatement, backpay, or compensatory damages, a plaintiff may still be required to show that the discrimination was a "but-for cause of the employment outcome." *Id.* at 1177–78. In *Bostock v. Clayton County*, a Title VII employment discrimination case, the Supreme Court explained but-for causation: "[A] but-for test directs [the Court] to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." 140 S. Ct. 1731, 1739 (2020).

The Secretary argues that Young cannot show that retaliatory animus was the but-for cause of the March reprimand and reassignment and July evaluation downgrade because both decisions were justified by the results of the administrative investigation. Def.'s Mem. at 30. The Secretary is incorrect. A key domino in the chain of causation in this case is Paschal's decision to initiate the administrative investigation. As is explained above, a reasonable jury could conclude that Paschal's motivation in instituting the administrative investigation was driven by retaliatory animus. If that fact is changed (i.e. the administrative investigation is not initiated), the outcome

(i.e. the March reprimand and reassignment and July evaluation downgrade) likewise changes because the Secretary's justification for the adverse actions no longer exists.

Accordingly, a reasonable jury could conclude that the retaliatory animus was a but-for cause of the March reprimand and reassignment and the July evaluation downgrade.

## V. CONCLUSION

For the reasons stated above, the Court finds that Young presents sufficient evidence to raise a genuine issue of material fact that (1) Young engaged in protected oppositional activity prior to March 23, 2016, (2) that the decisionmaker for the challenged personnel actions had knowledge of Young's protected activity, (3) that the March reprimand and reassignment were the result of retaliatory animus, (4) that the July evaluation downgrade was a result of retaliatory animus, and (5) Young may be entitled to reinstatement or other monetary and compensatory damages if he prevails on his claim. Accordingly, the Secretary's Motion for Summary Judgment, ECF No. 32, will be denied.

An appropriate order shall issue.

_____
/s/
Elizabeth W. Hanes
United States District Judge

Newport News, Virginia
Date: March 30, 2023

34